**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE
2007 NOV -1  P 4: 30

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| CHARLES M. SCOTT and PAMELA SCOTT,<br><br>Plaintiffs,<br><br>v.<br><br>VERMONT MUTUAL INSURANCE COMPANY,<br><br>Defendant. | CIVIL ACTION NO. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### INTRODUCTION

Plaintiffs Charles M. Scott and Pamela Scott (collectively, "the Scotts") bring this action against defendant Vermont Mutual Insurance Company ("VT Mutual") to recover damages for multiple unfair insurance claims settlement practices by VT Mutual in violation of G.L. c. 176D and 93A. This action stems from an incident in which Mr. Scott sustained serious injuries upon falling from the second floor porch of a rental dwelling owned by VT Mutual's insureds, Stuart and Ellen Garfield (collectively, "the Garfields"), when a guardrail on the porch collapsed. VT Mutual, in knowing and willful violation of G.L. c. 176D and 93A: attempted to wear down the Scotts by failing to acknowledge liability once it was reasonably clear and by failing to make any timely and reasonable settlement offer; low balled the Scotts with belated bad faith/unreasonable settlement offers; forced the Scotts to try their claims in the Essex County Superior Court despite the fact that discovery revealed that liability/damages were reasonably clear; failed to pay a judgment in the Scotts' favor; and failed to reasonably investigate the viability of appellate

issues, thereby pursuing an appeal on counts with no reasonable likelihood of prevailing on the same.

## PARTIES

1.  Plaintiff Charles M. Scott, an individual and natural person, is a citizen of the State of Maine. He resides in Portland, Maine. At all times relevant to this case and up until January 2007, Charles Scott was a citizen of Massachusetts. He is married to Pamela Scott.

2.  Plaintiff Pamela Scott, an individual and natural person, is a citizen of the State of Maine. She resides in Portland, Maine. At all times relevant to this case and up until January 2007, Pamela Scott was a citizen of Massachusetts.

3.  Defendant Vermont Mutual Insurance Company, a corporation, was incorporated in the State of Vermont and has a principal place of business in Montpelier, Vermont.

## JURISDICTION

4.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, as the plaintiffs have citizenship diverse from the defendant, and the amount in controversy, exclusive of interest, exceeds $75,000.

5.  At all relevant times, VT Mutual issued insurance policies and conducted business in Massachusetts and is subject to the jurisdiction of this Court.

6.  The events and omissions giving rise to this Complaint occurred, to a substantial extent, in this judicial district.

## FACTS

### The Guardrail Collapse

7.  On July 20, 2002, Mr. Scott fell from the second floor front porch of a dwelling located at 111 Ocean Street in Lynn, Massachusetts ("the Premises").

8. At the time that Mr. Scott fell, he was visiting his friend, Sherry Baker, who (at that time) was the tenant of the second floor apartment of the Premises.

9. At the time that Mr. Scott fell, the Premises was owned by Stuart T. Garfield and Ellen M. Garfield, who lived on the first floor of the Premises and rented the second floor apartment to Ms. Baker.

10. When Mr. Scott fell, the Garfields were insured under a homeowner's insurance policy issued by VT Mutual that covered the Premises and the Garfields' liability for Mr. Scott's fall.

11. Mr. Scott fell from the Premises when the guardrail assembly on the second floor front porch collapsed because it was in poor repair and unable to provide the protection for which it was intended. The guardrail violated the Massachusetts Building and Sanitary Codes.

12. As a result of the fall, Mr. Scott sustained severe and permanent injuries, including a fracture and dislocation of his left shoulder.

### VT Mutual's Interview of Mr. Scott on August 2, 2002

13. On August 2, 2002, VT Mutual's Staff Claims Adjustor, Jeremy Henrichson, interviewed Mr. Scott concerning his fall on July 20, 2002.

14. During the interview, Mr. Scott described the circumstances surrounding his fall and the initial surgery and other medical treatment he received for the injuries he sustained in the fall.

15. In summary, Mr. Scott told Mr. Henrichson that he was shaking out an area rug on the front exterior porch of the Premises. Mr. Scott explained that he leaned over the subject guardrail and shook the rug out, and, as he straightened from his leaning position, he came in contact with the guardrail, heard a crack, and felt the guardrail break away from the porch. Mr.

Scott further explained that the guardrail collapsed and fell, along with Mr. Scott, to the ground below. Mr. Scott stated that he had consumed alcohol prior to his fall.

16. Mr. Scott also informed Mr. Henrichson that, after his fall, the Garfields' second floor tenant, Sherry Baker, told Mr. Scott that Stuart Garfield had stated before the fall that the railings and posts on the second floor front porch were rotted and needed to be replaced.

### Spoliation of Evidence by Mid-August 2002

17. At some point after Mr. Scott's fall, Mr. Garfield gave the subject guardrail to VT Mutual.

18. As of August 2, 2002, VT Mutual was aware that Mr. Scott was represented by counsel, and the inevitability of a claim was obvious. Accordingly, both the Garfields and VT Mutual had an obligation to preserve relevant evidence.

19. Nevertheless, by mid-August 2002, Mr. Garfield destroyed the bottom section of the guardrail assembly and the columns to which the guardrail had been attached.

### The Scotts' Settlement Demand of December 5, 2003

20. On December 5, 2003, counsel for the Scotts sent a settlement demand to the Garfields and VT Mutual, which outlined the circumstances of Mr. Scott's fall.

21. The Scotts' December 5, 2003 letter stated that Mr. Scott had undergone three surgeries on his left shoulder at the Massachusetts General Hospital, engaged in extensive physical therapy, experienced ongoing pain, and that he had been unable to work for periods of time. Copies of Mr. Scott's medical records were provided with the letter.

22. The Scotts' December 5, 2003 letter reported that Mr. Scott's medical expenses exceeded $150,000, that his treatment was ongoing, such that additional medical expenses would accrue, and it identified Mr. Scott's lost wages from his employment in the amount of $13,680.

23. The Scotts' December 5, 2003 letter asserted that the Garfields were liable (a) to Mr. Scott based on theories of negligence, breach of the warranty of habitability, and G.L. c. 93A for the warranty claim, and (b) to Mrs. Scott for loss of consortium.

24. The December 5, 2003 letter conveyed a settlement demand in the amount of $675,000.

### The January 29, 2004 Response to the Scotts' Settlement Demand

25. VT Mutual retained the law firm of Gillespie & Associates to respond to the Scotts' December 5, 2003 settlement demand.

26. In response to the Scotts' demand, attorney Christopher Driscoll of Gillespie & Associates denied liability for Mr. Scott's fall by letter dated January 29, 2004.

27. In denying liability for Mr. Scott's fall, Mr. Driscoll's letter ignored evidence of the Garfields' knowledge of the condition of the subject guardrail, and it sought to intimidate and disparage the Scotts by mischaracterizing the medical records.

28. VT Mutual made no settlement offer in response to the Scotts' settlement demand of December 5, 2003.

### The Underlying Complaint

29. On February 19, 2004, the Scotts filed a Complaint in the Essex County (Massachusetts) Superior Court against the Garfields seeking damages as a result of Mr. Scott's fall.

30. The Complaint asserted claims that the Garfields were liable for the fall (a) to Mr. Scott based on theories of negligence, breach of the warranty of habitability, and G.L. c. 93A for the warranty claim, and (b) to Mrs. Scott for loss of consortium.

### The Scotts' Document Production of June 22, 2004

31. On June 22, 2004, the Scotts produced documents in response to the Garfields' Rule 34 request for production of documents.

32. The Scotts' document production of June 22, 2004 included a copy of a July 31, 2002 e-mail that Sherry Baker sent to Mr. Scott. This e-mail provided evidence of Mr. Garfield's prior knowledge of the guardrail's defective condition, such as statements by Mr. Garfield that the railings were not secure and needed to be repaired.

### Mr. Scott's Deposition and Answers to Interrogatories

33. By June 24, 2004, the defense received Mr. Scott's signed answers to interrogatories and conducted depositions of Mr. and Mrs. Scott.

34. Mr. Scott's answers to interrogatories and deposition established that he came into light contact with the guardrail, the guardrail collapsed by detaching from the columns at both ends, and he fell to the ground below.

35. Mr. Scott described in the interrogatory answers and at his deposition that two-years post-accident, and after various surgeries, he had ongoing shoulder pain and could raise his left arm only slightly higher than shoulder level.

### Deposition of Mr. Garfield

36. On November 22, 2004, Mr. Garfield testified at a deposition.

37. Mr. Garfield's deposition testimony revealed that he had told Sherry Baker in May 2000 that he planned to perform repairs to the second floor front porch over the summer of 2000, but that he never performed any repairs or maintenance to the guardrail that ultimately collapsed in July 2002. Mr. Garfield also testified that it was possible that he told Ms. Baker,

prior to the accident, that the railings were in poor condition and could not support any significant weight.

### Deposition of Sherry Baker

38. On February 16, 2005, Sherry Baker was deposed, and she testified that in May of 2000, Mr. Garfield told her that it would be a good time to repair both the front porch and the side porch, and that the railings on the front porch were in poor condition and not meant to support weight, and that he planned to repair them, but no repairs of the subject guardrail was made.

### Mr. Scott's Supplemental Answers to Interrogatories

39. On March 15, 2005, Mr. Scott served supplemental answers to the Garfields' interrogatories that identified $154,307.90 in medical bills and $13,680.00 of lost wages as special damages.

40. Mr. Scott's supplemental answers to interrogatories also provided expert disclosures relative to John W. Mroszczyk, PhD, PE, CSP and Thomas J. Gill, IV, M.D.

41. Mr. Scott's expert disclosures of March 15, 2005, indicated that the porch and subject guardrail violated the Massachusetts State Sanitary Code and Building Code. The expert disclosures also identified Mr. Mroszczyk's opinions that the balusters within the guardrail assembly were rotted and that the guardrail assembly failed to provide sufficient resistance to the normal concentrated human load that Mr. Scott imposed at the time of his accident.

42. Mr. Scott's disclosure of March 15, 2005, regarding Dr. Gill summarized Mr. Scott's shoulder injuries, surgeries and other treatment, including Mr. Scott's increased risk of degenerative arthritis, loss of range of motion for his left arm, and inability to lift more than 20 pounds with his left arm.

### Liability and Damages Were Reasonably Clear by March 15, 2005

43. As of March 15, 2005, both liability and damages were reasonably clear to VT Mutual.

44. VT Mutual should have been aware as of March 15, 2005, that a verdict would certainly exceed $400,000 due to evidence of approximately $174,000 of past special damages, plus the likely cost of a future shoulder replacement (later identified by Dr. Gill as costing approximately $30,000), along with Mr. Scott's past pain and suffering, future pain and suffering and permanent disability, combined with Mrs. Scott's loss of consortium. In addition, pre-judgment interest on such a figure, as of March 15, 2005, amounted to $52,000.

45. If VT Mutual had conducted a reasonable investigation and considered the available information, it would have -- or should have -- made a settlement offer in the amount of at least $450,000 in March 2005. The Scotts would have accepted such an offer.

### The Garfields' Supplemental Answers to Expert Interrogatories

46. On May 17, 2005, the Garfields served their supplemental answers to expert interrogatories. The Garfields' architectural expert had no explanation for the accident and no opinion as to whether the porch and guardrail complied with applicable provisions of the Building or Sanitary Codes. The Garfields' medical expert opinion contained no contradiction of the Scotts' expert's opinion.

### Settlement Efforts

47. On July 14, 2005, Roy R. Roemer, Jr., of the Rawlings Company sent Mr. Gillespie a summary of medical expenses paid by Tufts Health Plan on behalf of Mr. Scott. This communication identified the amount of Tufts' medical lien on Mr. Scott's claim to be in excess of $70,000.

48. On August 11 & 12, 2005, the Scotts sent Mr. Gillespie notices pursuant to G.L. c. 233, §79G regarding the medical bills and records that the Scotts would introduce at trial. The medical bills and expenses totaled $163,548.21.

49. In response to Mr. Gillespie's inquiry, counsel for the Scotts wrote to Mr. Gillespie on August 26, 2005 to outline the Scotts' settlement position. The August 26, 2005 letter recapitulated the evidence of special damages exceeding $200,000 (including the cost of a future shoulder replacement), Mr. Scott's substantial pain/suffering/disability, the accrual of prejudgment interest, and the liability evidence revealed in Ms. Baker's and Mr. Garfield's depositions.

50. The August 26, 2005 letter also reiterated -- in response to VT Mutual's theory of defense -- that Mr. Scott's alcohol consumption on the day of his fall did not cause the collapse of the porch guardrail assembly.

51. The Scotts' August 26, 2005 letter indicated that the Scotts would accept a settlement within the limits of the Garfields' $500,000 insurance policy with VT Mutual.

52. VT Mutual made no offer in response to the Scotts' August 26, 2005 letter.

### Court-Sponsored Conciliation Conference

53. At the request of Mr. Gillespie, and with the agreement of the Scotts, a court-sponsored conciliation was scheduled for March 8, 2006. The notice issued by the Court stated that "All trial counsel and their clients including insurers must be present, failure to attend may result in the imposition of sanctions."

54. Counsel for the Scotts attended the conciliation along with the Scotts.

55. Mr. Gillespie attended the conciliation alone on behalf of the Garfields and VT Mutual.

56. At the conciliation, the Scotts expressed a willingness to settle within the $500,000 policy limits. After the conciliation, Mr. Gillespie stated that he had $48,000 of settlement authority and that he was only "the messenger."

57. As of March 2006, Vermont Mutual was well aware that:

  a. there was irrefutable evidence that the porch guardrail violated relevant provisions of the Massachusetts Building Code and Sanitary Code;

  b. Mr. Garfield would not refute Ms. Baker's testimony establishing that Mr. Garfield knew about the poor condition of the porch and railings more than two years prior to the accident;

  c. Mr. Garfield had articulated an intention to replace the railings during the summer of 2000, but failed to perform any repairs to the porch or railings as of July 20, 2002, the date of Mr. Scott's accident;

  d. Mr. Scott was permanently disabled with a significant loss of range of motion, strength and endurance in his shoulder as a result of his fall from the Garfields' porch;

  e. the Scotts would introduce evidence of special damages exceeding $200,000;

  f. the defense lacked any evidence to contradict the evidence of Mr. Scott's disability or medical expenses; and

  g. Tufts Health Plan had a medical lien on Mr. Scott's claim in excess of $70,000.

### The Trial

58. The trial of the Essex Superior Court action began on July 10, 2006.

59. On July 13, 2006, Mr. Gillespie communicated VT Mutual's settlement offer in the amount of $150,000, conditioned upon the Scotts providing a complete release of the Garfields and VT Mutual. This belated offer was unreasonable and the Scotts rejected it.

60. On July 17, 2006, Mr. Gillespie conveyed a written settlement offer in the amount of $225,000, again conditioned upon a full release of the Garfields and VT Mutual. Implicit in Mr. Gillespie's written offer was an acknowledgement that the Scotts would prevail, along with a threat that VT Mutual would appeal.

61. On July 18, 2006, the Scotts rejected VT Mutual's $225,000 settlement offer.

62. On July 18, 2006, the trial concluded and the jury returned verdicts in favor of Mr. Scott based on negligence and breach of warranty theories. On the negligence count, the jury found the Garfields 80% negligent and Mr. Scott 20% comparatively negligent. Comparative negligence does not apply to a claim for breach of warranty.

63. The jury awarded Mr. Scott $450,000 in damages and awarded Mrs. Scott $4,000 for loss of consortium. The jury's verdict made the liability of VT Mutual's insureds more than reasonably clear.

64. On July 19, 2006, the Court entered judgment in favor of Mr. Scott against the Garfields in the amount $580,340.87, including interest. The Court entered judgment in favor of Mrs. Scott against the Garfields in the amount of $5,158.59, including interest.

65. On July 31, 2006, the Garfields filed a notice of appeal in the Essex Superior Court action.

66. VT Mutual has failed to pay any portion of the judgment, even though it lacks any reasonable basis for appealing the portion of the verdict and judgment that is based on negligence.

## Chapter 93A Demand Letter

67. On September 20, 2006, the Scotts sent VT Mutual a written demand for relief, certified mail, return receipt requested, pursuant to G.L. c. 93A §§ 2 and 9. A copy of this demand letter, without exhibits, is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

68. The Scotts' Chapter 93A demand letter requested VT Mutual to pay the judgment against the Garfields, outlined VT Mutual's violations of G.L. c. 93A and 176D, and demanded

$878,249.19 (150% of the judgment against the Garfields) to settle the Scotts' claims against VT Mutual for violating G.L. c. 93A and 176D.

69. By letter dated October 11, 2006, VT Mutual responded to the Scotts' Chapter 93A demand letter, denying any violation of G.L. c. 93A and 176D, and refusing to make an offer to settle any of the Scotts' claims.

### Chapter 93A

70. G.L. c. 93A § 9(1) provides that "any person whose rights are affected by another person violating the provisions of [G.L. c. 176D § 3(9)]" may bring an action pursuant to G.L. c. 93A § 9.

71. VT Mutual has violated G.L. c. 93A with respect to the Scotts by engaging in conduct that is specifically prohibited by G.L. c. 176D § 3(9).

72. VT Mutual's use or employment of unfair and/or deceptive acts or practices, was a willful or knowing violation of G.L. c. 93A and G.L. c. 176D § 3(9).

73. VT Mutual's refusal to grant relief upon demand was made in bad faith, with knowledge or reason to know that its acts or practices violated G.L. c. 93A and G.L. c. 176D § 3(9).

74. At all times material to this Complaint, VT Mutual has been engaged in the conduct of trade or commerce within the meaning of G.L. c. 93A.

75. VT Mutual's unfair and/or deceptive acts or practices occurred primarily and substantially (and had their impact) in Massachusetts.

## COUNT I
### Breach of G.L. c. 93A By Virtue of Violating G.L. c. 176D § 3(9)(c)
**(Failing to Adopt/Implement Reasonable Standards for Prompt Investigation of Claim)**

76. The Scotts repeat and reallege the allegations contained in paragraphs 1 through 75 as set forth above.

77. VT Mutual has violated G.L. c. 176D § 3(9)(c) and G.L. c. 93A by failing to adopt and implement reasonable standards for the prompt investigation of the Scotts' claims that arose out of the applicable insurance policy held by the Garfields and issued by VT Mutual.

78. If VT Mutual adopted and/or implemented reasonable standards for the prompt investigation of the Scotts' claims, it would have (or should have) effectuated a fair and equitable settlement of the Scotts' claims.

79. As a consequence of VT Mutual's above-described unfair and/or deceptive acts or practices, the Scotts have sustained, and continue to sustain, damages.

## COUNT II
### Breach of G.L. c. 93A By Virtue of Violating G.L. c. 176D § 3(9)(d)
**(Refusing to Pay Claims Without Conducting a Reasonable Investigation)**

80. The Scotts repeat and reallege the allegations contained in paragraphs 1 through 79 as set forth above.

81. VT Mutual has violated G.L. c. 176D § 3(9)(d) and G.L. c. 93A by refusing to pay the Scotts' claim without conducting a reasonable investigation based upon all available information.

82. If VT Mutual conducted a reasonable investigation, and considered information unfavorable to its insureds' liability, it would have (or should have) effectuated a fair and equitable settlement of the Scotts' claims.

83. As a consequence of VT Mutual's above-described unfair and/or deceptive acts or practices, the Scotts have sustained, and continue to sustain, damages.

### COUNT III
### Breach of G.L. c. 93A By Virtue of Violating G.L. c. 176D § 3(9)(f)
**(Failing to Effectuate Prompt, Fair and Equitable Settlements of Claims In Which Liability Has Become Reasonably Clear)**

84. The Scotts repeat and reallege the allegations contained in paragraphs 1 through 83 as set forth above.

85. VT Mutual has violated G.L. c. 176D § 3(9)(f) and G.L. c. 93A by failing to effectuate a prompt, fair and equitable settlement of the Scotts' claims once liability became reasonably clear.

86. If VT Mutual complied with its obligations under G.L. c. 176D § 3(9)(f) and G.L. c. 93A, it would have (or should have) effectuated a fair and equitable settlement of the Scotts' claims.

87. As a consequence of VT Mutual's above-described unfair and/or deceptive acts or practices, the Scotts have sustained, and continue to sustain, damages.

### COUNT IV
### Violation of G.L. c. 93A §§ 2, 9
**(Unfair or Deceptive Acts or Practices)**

88. The Scotts repeat and reallege the allegations contained in paragraphs 1 through 87 as set forth above.

89. VT Mutual has violated G.L. c. 93A §§ 2 and 9, by its unfair or deceptive acts and/or practices in the conduct of trade or commerce, including its unfair or deceptive insurance claims settlement practices, such as:

   a. Attempting to wear out the Scotts by ignoring facts, failing to acknowledge liability and unduly delaying settlement once liability became reasonably clear;

b. Low balling the Scotts with bad faith and unreasonable settlement offers in light of the circumstances and information available;

c. Offering the Scotts, as a settlement, amounts substantially less than the amounts they were ultimately deemed to be entitled;

d. Forcing the Scotts to continue to engage in litigation once discovery revealed that its insureds' liability and the Scotts' damages were reasonably clear;

e. Failing to pay the judgment in the Scotts' favor on the negligence count; and

f. Failing to reasonably investigate the viability of appellate issues and pursuing an appeal on counts with no reasonable likelihood of prevailing on an appeal of those counts.

90. If VT Mutual complied with its obligations under G.L. c. 93A § 2, it would have (or should have) effectuated a fair and equitable settlement of the Scotts' claims.

91. As a consequence of VT Mutual's above-described unfair and/or deceptive acts or practices, the Scotts have sustained, and continue to sustain, damages.

## Prayer for Relief

WHEREFORE, plaintiffs Charles M. Scott and Pamela Scott demand judgment against defendant Vermont Mutual Insurance Company for all relief allowed under law, including:

a. Damages, together with interest, in an amount to be determined at trial;

b. Multiple damages, together with interest, pursuant to G.L. c. 93A;

c. Attorneys' fees and costs of this action pursuant to G.L. c. 93A; and

d. All such other relief that this Court deems just and equitable.

## JURY DEMAND

At the discretion of the Court, the Scotts claim a jury trial on all counts so triable.

Respectfully submitted,

CHARLES M. SCOTT and PAMELA SCOTT,

By their attorneys,

_____
Thomas H. Hayman, BBO# 557279
Carl E. Fumarola, BBO# 659019
CETRULO & CAPONE LLP
Two Seaport Lane, 10th Floor
Boston, MA 02210
Tel: (617) 217-5500
Fax: (617) 217-5200
Email: thayman@cetcap.com
cfumarola@cetcap.com

Dated: November 1, 2007