UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLES M. SCOTT and PAMELA    )
SCOTT                          )
                               )     CIVIL ACTION NO.
              Plaintiffs,      )     07-12081-DPW
                               )
       v.                      )
                               )
VERMONT MUTUAL INSURANCE       )
COMPANY,                       )
                               )
              Defendant.       )
                               )

MEMORANDUM AND ORDER
September 22, 2011

Plaintiffs Charles M. Scott and Pamela Scott brought this action against Vermont Mutual Insurance Company ("Vermont Mutual"), alleging unfair insurance claims settlement practices in violation of MASS. GEN. LAWS chs. 176D and 93A.  The action arises out of Mr. Scott's fall from the porch of a rental dwelling owned by Stuart and Ellen Garfield, insureds of Vermont Mutual.  The parties have filed cross-motions for summary judgment on all claims.

**I. BACKGROUND**

*A.    Factual Background and Pre-Trial Investigation and Discovery*

On July 20, 2002, Mr. Scott fell from the second-floor porch of a dwelling at 111 Ocean Street in Lynn, Massachusetts.  The Scotts were visiting Sherry Baker, a friend who was at that time a tenant on the second floor of 111 Ocean Street.  Ms. Baker rented the residence from the Garfields, who lived on the first

floor of the premises.  The Garfields had insured the premises

with a homeowner's insurance policy issued by Vermont Mutual.

Vermont Mutual began collecting information about the

accident shortly after it was notified of the loss on July 22,

2002.  In August of 2002, Mr. Scott prepared a statement of the

incident and described the fall from the porch as follows:

> At the time of the accident, I was shaking out an area
> rug. . . .  As I was shaking out the rug, I was leaning
> over the railing on the front exterior porch.  I was
> not leaning against the railing as I was shaking out
> the rug. . . . As I was standing up from my leaning
> position, I came into contact with the railing with
> either my leg or my left hand. I heard a moist crack
> and felt the railing break away from the porch. . . . I
> believe the railing may have pulled me forward as it
> broke off from the porch.

Mr. Scott also stated that he did not lose his balance at the

time of the fall and noted that he had consumed 1.5 twelve-ounce

bottles[1] of beer.  Although Mrs. Scott was also on the porch at

the time of the fall, she did not see it, and there were no

witnesses.

Mr. Scott stated that, after the accident, he learned from

Ms. Baker that Mr. Garfield had previously mentioned that the

porch railing was rotted and needed to be replaced.

When Jeremy Henrichson, the Vermont Mutual claims adjuster,

recorded his initial assessment in the claim file, he expressed

---

[1]  Although not included in the statement, it was later
determined that Mr. Scott had also had a glass of wine earlier in
the day.  *Scott v. Garfield*, 912 N.E.2d 1000, 1004 (Mass. 2009).

skepticism regarding the accuracy of Mr. Scott's account.  Mr. Henrichson noted that, although certain facts appeared unfavorable to the insured, the "description of accident is a little vague and [Mr. Scott] does not know what caused railing to fall exactly."  Mr. Henrichson further observed that the "description of accident does not make sense."  In particular, Mr. Henrichson questioned if Mr. Scott "did not lose balance or slip while leaning over railing, what would cause him to fall[?]"  Mr. Henrichson's supervisor described liability as "questionable" in a response to Mr. Henrichson's assessment.

On January 24, 2003, Mr. Henrichson noted that he had received Mr. Scott's medical records, which provided information as to Mr. Scott's blood-alcohol level and indicated that Mr. Scott reported typically drinking six or more beers a day.  Mr. Henrichson concluded that "liability remains extremely questionable and [Mr. Scott's] level of intoxication may be more than he reported in statement."  On June 12, 2003, he noted: "Liability remains very questionable.  However as the second story railing broke allowing [Mr. Scott] to fall, we are open to considering some type of settlement with a considerable degree of comparative neg[ligence] factored in."

On August 1, 2003, Mr. Henrichson reported learning from the Scotts' attorney that the Scotts were considering filing a complaint.  Mr. Henrichson requested updated medical files from

the attorney and indicated that, once they were received, Vermont Mutual would be open to discussing resolution of the claims. Based on updated medical information, Mr. Henrichson recommended that existing reserves be increased.  On September 24, 2003, Mr. Henrichson reported learning from the Scotts' attorney that Mr. Scott had undergone an additional surgery and would be receiving care and unable to work for some time.

In December of 2003, Plaintiffs, by counsel, sent a letter demanding settlement[2] to the Garfields, detailing Mr. Scott's injuries and resulting losses, and requesting $675,000 in compensation.  The letter described Mr. Scott's ongoing treatment, medical expenses of $150,283.95, and lost wages in the amount of $29,670, as well as damages resulting from pain and suffering, loss of enjoyment of life, and loss of consortium. The demand indicated that Mr. Scott's claims were based on a breach of the implied warranty of habitability and negligence.

After receipt of the demand letter, Vermont Mutual retained outside counsel, and Mr. Henrichson's note to file reflected the following observations: (1) the demand letter alleged permanent injuries, but documentation of permanency had not been received;

---

[2]  This letter was styled as a demand letter pursuant to MASS. GEN. LAWS ch. 93A, §§ 2 and 9, but cited violations of the implied warranty of habitability and no violations of ch. 176D, § 3, the basis of the present suit.  A second demand letter, received by the Garfields in 2006, forms the basis for the discussion *infra* at Section II.B.

4

(2) additional medical and income records were requested and an expert had been retained to examine the railing which had given way; and (3) there was conflicting case law with respect to the applicability of the implied warranty of habitability to a guest of a tenant.  Vermont Mutual's outside counsel responded on behalf of the Garfields in January of 2004.  The letter communicated Vermont Mutual's intention not to make any offer of settlement and detailed the reasons for the denial, noting questions around the implied warranty of habitability doctrine, the Garfields' negligence, and Mr. Scott's contributory negligence.

Plaintiffs, who were residents of Massachusetts at the time, filed a complaint against the Garfields in Essex County Superior Court in February of 2004 (No. 04-00325), asserting that the Garfields were negligent and breached the implied warranty of habitability.  *Scott v. Garfield*, 912 N.E.2d 1000, 1004 (Mass. 2009).  Vermont Mutual's outside counsel represented the Garfields throughout discovery, trial and appeal.

In June 2004, Plaintiffs turned over an e-mail from Ms. Baker to Mr. Scott sent on July 31, 2002, shortly after the accident.  In the e-mail, Ms. Baker described conversations with Mr. Garfield prior to the accident regarding the condition of two second-floor porches, including the one from which Mr. Scott fell, in which Mr. Garfield stated that the porches were in "poor

condition," "none of the wood on the posts or railings was secure," and the railings were "decorative pieces not meant to support significant weight."  The e-mail also stated that although Mr. Garfield had communicated that repairs needed to be done to the porches, no work had been completed on the porch at issue by the time of the accident.

In November 2004, Mr. Garfield gave a deposition in which he stated that, prior to the accident, he had shown Ms. Baker an area of rot on one of the columns supporting the railing that gave way in the accident and told her that he planned to repair the porches.  Mr. Garfield had no specific memory of discussing the railings with Ms. Baker or stating that they were not secure, and he stated that he had removed the rot identified on the column and made certain other repairs to the porches.  When counsel asked whether he had told Ms. Baker the railings were decorative, and not meant to support significant weight, Mr. Garfield said "Sounds like something I would say," but had no specific recollection of making such a statement or coming to this conclusion prior to the accident.

Ms. Baker was deposed in February of 2005, and her testimony reiterated certain of her e-mail statements.  In particular, she stated that Mr. Garfield had said in 2000 that he was going to make repairs to the porches and that the railings "were for decoration" and "in poor condition."

6

In March 2005, Vermont Mutual received supplemental answers from the Plaintiffs which disclosed that, as of that date, Mr. Scott had incurred $154,307.90 in medical expenses and $13,680 in lost wages.  The Scotts also disclosed expert testimony in support of the argument that the Garfields had violated the Massachusetts State Sanitary Code and Building Code with respect to the porch.  Expert testimony was also referenced that would address rot in the guardrail assembly and detail Mr. Scott's continuing disability.

On July 15, 2005, Vermont Mutual's outside counsel characterized the case as follows:

> [T]his is a case of colorable liability but certainly short of the 93A standard that liability is 'reasonably clear.'  There are very serious issues about how the accident happened and the plaintiff's alcohol ingestion.  The notion that the railing collapsed at both connecting points without significant contact by the plaintiff is going to be difficult for him to sell.

Defense theories were summarized by counsel in a June 25, 2005 status report as "Comparative negligence on negligen[ce] count. Alcohol consumption, lack of notice to landlord of defect, lack of credibility on happening of accident by plaintiff and witness."

## B.   *Settlement Efforts and Trial*

The parties participated in a conciliation session on March 8, 2006.  At the conciliation, Vermont Mutual made a settlement offer of $48,000.  Plaintiffs responded with a counter-offer of

$500,000, the full amount of the Garfields' insurance policy. The parties did not arrive at a settlement at this time.

Vermont Mutual made several settlement offers before and during trial. On June 27, 2006, Vermont Mutual made a $500,000-$75,000 high-low offer (limiting the Scotts' recovery to $500,000 if they prevailed and guaranteeing at least $75,000 if Vermont Mutual prevailed). On July 13, 2006, three days after the start of trial, Vermont Mutual made a settlement offer in the amount of $150,000, conditioned on the release of claims against both the Garfields and Vermont Mutual. On July 17, Vermont Mutual made a $225,000 settlement offer, also conditioned on the release of claims against Vermont Mutual. All offers were rejected

On July 18, 2006, the jury returned special verdicts in favor of Mr. Scott with respect to both negligence and breach of the implied warranty of habitability, and for Pamela Scott on her loss of consortium claim. The jury also found that Mr. Scott had been comparatively negligent and found comparative negligence of twenty per cent on his part.[3] Judgment entered for Mr. Scott on the breach of the warranty of habitability claim (and not the

---

[3] Massachusetts' contributory negligence statute provides that "any damages allowed" against a defendant "shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage, or death recovery is made." MASS. GEN. LAWS ch. 231, § 85. The combined total of negligence of the plaintiff and other parties is 100%, and the damages are attributed based on the relative negligence of each party. *Id.*

claim for negligence), in which he recovered $450,000, the full amount of damages found by the jury.  Pamela Scott was awarded $4000.  The Garfields, still represented by Vermont Mutual, moved for judgment notwithstanding the verdict or, alternatively, a new trial; both motions were denied.  The Garfields appealed, and the Supreme Judicial Court took the case *sua sponte*.  *Scott*, 912 N.E.2d at 1004.

On September 20, 2006, the Scotts' attorney sent a letter to Vermont Mutual alleging that it had willfully failed to make a fair, prompt settlement offer in violation of MASS. GEN. LAWS chs. 176D and 93A.  Plaintiffs requested $878,249.19 for the settlement of the alleged willful violations of chs. 93A and 176D.  On October 11, 2006, Vermont Mutual responded to the demand letter, denying violations of chs. 93A and 176D and contending that liability was not reasonably clear and that past settlement offers were reasonable.  Vermont Mutual declined to make a further settlement offer at that time.

## C.   *Appeal to the Supreme Judicial Court*

The Garfields appealed the judgment on both the implied warranty of habitability and negligence theories.  *Scott,* 912 N.E.2d at 1003.  They argued that a guest of a tenant cannot recover damages for a breach of the implied warranty of habitability by the owner, a question of first impression for the Supreme Judicial Court.  They also argued that the negligence

judgment should be vacated due to two evidentiary errors by the trial judge

The first evidentiary ruling challenged by Vermont Mutual related to spoliation.  *Id.*  After an evidentiary hearing, the trial judge found that the Garfields had been negligent in the spoliation of evidence when they disposed of the columns that had supported the porch railing.  *Id.* at 1007.  As a result, the Garfields were barred from presenting to the jury evidence of the condition of the columns, and the judge allowed the jury to draw adverse inferences from the columns' absence.  *Id.*

The second challenged evidentiary ruling related to the denial of the Garfields' motion to submit to the jury the amounts Mr. Scott's health insurer had actually paid to health care providers to settle his medical bills.  *Id.* at 1009.  The Garfields argued that the amounts paid were evidence of the reasonable cost of the medical expenses and should be considered notwithstanding the general prohibition on evidence of third-party payments imposed by the collateral source rule.  *Id.* at 1009.

On April 9, 2009, the Supreme Judicial Court ruled that a tenant's visitor may recover for personal injuries caused by a breach of the implied warranty of habitability.  *Id.* at 1005.  In reaching this conclusion, the Court also upheld the evidentiary rulings.  *Id.* at 1007-10.  Final judgment therefore entered for

the Scotts on the sums awarded by the jury in addition to twelve

per cent pre- and post-judgment interest.

D.   *Legal Background*

Plaintiffs brought the instant complaint against Vermont

Mutual alleging violations of MASS. GEN. LAWS chs. 176D and 93A,

which together prohibit unfair claims settlement practices on the

part of insurers.  "Unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or

commerce are . . . unlawful" under ch. 93A, § 2.  Unfair or

deceptive acts or practices "in the business of insurance," are

specifically enumerated in ch. 176D, § 3, and include "unfair

claims settlement practices" described at § 3(9).  Thus, the

activities described at ch. 176D, § 3 constitute violations of

ch. 93A.  *See Hopkins v. Liberty Mut. Ins. Co.*, 750 N.E.2d 943,

949 (Mass. 2001) (explaining that a violation of ch. 176D, § 3

constitutes a violation of ch. 93A, § 2).  The purpose of this

statutory scheme is "to encourage the settlement of insurance

claims . . . and discourage insurers from forcing claimants into

unnecessary litigation to obtain relief."  *Clegg v. Butler*, 676

N.E.2d 1134, 1139 (Mass. 1997) (internal citation omitted).

Plaintiffs allege that Vermont Mutual engaged in unfair

claim settlement practices by "[f]ailing to adopt and implement

reasonable standards for the prompt investigation of claims

arising under insurance policies;" "[r]efusing to pay claims

without conducting a reasonable investigation based upon all available information;" and "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." MASS. GEN. LAWS ch. 176D, §§ 3(9)(c), (d),(f). Plaintiffs argue that other practices also violate ch. 93A.

Parties who have been injured by violations of ch. 176D, § 3 may bring an action for damages or other relief under ch. 93A, § 9.[4] Thirty days prior to the filing of such an action, the claimant must make a "written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered" and deliver it to the potential respondent. MASS. GEN. LAWS ch. 93A, § 9(3). The respondent may then make an offer to settle the claims, and if the offer is reasonable, relief is limited to that amount. *Id.* If the claims are not settled and a court finds for the claimant, the claimant is entitled to actual damages, and double or treble damages if the act or practice is found to be willful or knowing, or if "the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of" constituted a violation of ch. 93A. *Id.* "Actual damages" for purposes of this provision are "the amount of the

---

[4] Persons who engage "in the conduct of any trade or commerce," i.e. commercial entities, are separately authorized to bring an action for violations of ch. 93A, § 2 under ch. 93A, § 11.

judgment on all claims arising out of the same and underlying transaction or occurrence." *Id.* The claimant is also entitled to attorney's fees if a violation is found. *Id.* § 9(4).

## II.  ANALYSIS

The parties move for summary judgment on all counts of the complaint.  Plaintiffs argue that Vermont Mutual's violations of ch. 176D include the following: (A) as of May 2005, the Garfields' liability was reasonably clear and Vermont Mutual was obligated to make a settlement offer; (B) there was no reasonable basis for appeal, and Vermont Mutual had an obligation to pay at least part of the lower court judgment prior to final review; (C) Vermont Mutual violated chs. 93A and 176D by conditioning its July 17, 2006 settlement offer on the release of claims against both the Garfields and Vermont Mutual and by making unreasonably low settlement offers in March 2006; and (D) Vermont Mutual failed to conduct a reasonable investigation and evaluated the case in bad faith.

Summary Judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).  When presented with

"cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997). As a result, I separately construe the record in the light most favorable to each party in turn, resolving all reasonable inferences in that party's favor to determine whether the summary judgment standard has been met. *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir. 2002).

The determination whether an insurer has met the standards set by ch. 176D, § 3 and ch. 93A is generally reserved for a finder of fact. *Bobick v. U.S. Fid. & Guar. Ins. Co.*, 781 N.E.2d 8, 10 (Mass. App. Ct. 2003) ("*Bobick I*") ("Whether an insurer has conducted an adequate investigation before denying a claim, whether liability has become reasonably clear, and whether a settlement offer is reasonable are factual determinations."); *see also Clegg*, 676 N.E.2d. 1139-40. However, certain actions may fall outside of the scope of a fact finder's determination. "'Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law.'" *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 54 (1st Cir. 1998) (quoting *Ahern v. Scholz*, 85 F.3d 774, 797 (1st Cir. 1996) (citation and internal quotations omitted)). Accordingly, I examine each allegation

14

from the respective party's perspective to evaluate whether chs. 93A and 176D have been violated, or not, as a matter of law.

**A.   *Vermont Mutual's Failure to Initiate Settlement in 2005***

Plaintiffs first argue that Vermont Mutual failed to make a fair and prompt settlement offer in the face of clear evidence of liability available to it as of May 2005, and that this failure amounts to a violation of MASS. GEN. LAWS chs. 93A and 176D.

<u>1.</u>  <u>Timing of Obligation to Settle</u>

As a threshold matter, Vermont Mutual contends that it had no obligation to make an offer of settlement *prior* to receiving the demand letter from the Scotts on September 20, 2006 giving notice of alleged violations of chs. 176D and 93A.  Vermont Mutual quotes the following passage in *Hopkins* to argue that the obligation to effectuate a settlement of claims only arises at the time a demand letter is received:

> General Laws c. 176D, § 3(9)(f) and G.L. c. 93A, § 9, together require an insurer such as the defendant promptly to put a fair and reasonable offer on the table when liability and damages become clear, either within the thirty-day period set forth in G.L. c. 93A, § 9(3), or as soon thereafter as liability and damages make themselves apparent.

*Hopkins*, 750 N.E.2d at 951.

The quoted language is somewhat ambiguous because there are two settlement obligations at issue.  The first, which constitutes the ch. 93A, § 2 unfair or deceptive practice, is the failure "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" in

15

conformance with ch. 176D, § 3(9)(f).  On its own, ch. 176D, § 3 does not create a private right of action, *see Adams v. Liberty Mut. Ins. Co.*, 799 N.E.2d 130, 136 n.14 (Mass. App. Ct. 2003), but rather outlines practices which violate ch. 93A, § 2.  The second settlement obligation arises out of the receipt of a letter demanding relief under ch. 93A, § 9(3).  It is only after a complainant has sent the demand letter that it has an *actionable* right to challenge the alleged failure to settle the claim.  MASS. GEN. LAWS ch. 93A, § 9.  A bad faith failure to settle the claim asserted in the demand letter opens the recipient to additional potential liability.  MASS. GEN. LAWS ch. 93A, § 9(3).

In summary, unfair or deceptive business acts, including those described in ch. 176D, § 3, are unlawful under ch. 93A, § 2, irrespective of the timing of receipt of a demand letter.  *See Rhodes v. AIG Domestic Claims, Inc.*, 937 N.E.2d 471, 476-77 (Mass. App. Ct. 2010) (determining the violation of the duty to make a settlement offer without reference to the receipt of the ch. 93A demand letter);[5] *Miller v. Risk Mgmt. Found. of the*

---

[5]   In *Rhodes v. AIG Domestic Claims, Inc.*, No. 05-1360, 2008 WL 2357015 (Mass. Super. Ct. June 3, 2008), Justice Gants, then serving on the Superior Court, noted that "an insurer may breach its obligation to effectuate a prompt settlement of a claim without a Chapter 93A demand letter, but the absence of such a demand may affect the determination of whether the obligation of promptness was breached." *Id*. at *20.  The judgment in *Rhodes* was affirmed, with modification, by the Massachusetts Appeals Court, *Rhodes v. AIG Domestic Claims, Inc.*, 937 N.E.2d 471 (Mass.

*Harvard Med. Insts., Inc.*, 632 N.E.2d 841, 846 (Mass. App. Ct. 1994) (affirming finding that liability was reasonably clear prior to receipt of demand letter).  The effect of the ch. 93A demand letter is to create actionable liability, which may include multiple damages and attorney's fees, if the insurer fails to respond adequately to the demand.  *See Hopkins*, 750 N.E.2d at 947; MASS. GEN. LAWS ch. 93A, §§ 9(3), (4).

Because a demand letter is not a prerequisite for the obligation to settle under ch. 176 D, § 3(9)(f), Vermont Mutual had the duty to effectuate a settlement as soon as its liability was reasonably clear regardless of whether a demand letter is received at that time.  In *Hopkins*, the claimant sent a demand for settlement in the amount of $700,000 on October 14, 1994, and when the insurer was not forthcoming, sent a ch. 93A demand letter, alleging violations of ch. 176D, on December 29, 1994. 750 N.E.2d at 946.  In the jury-waived trial, the judge determined that, because liability was reasonably clear, the insurer violated ch. 176D, § 3(9)(f) "by failing to tender a fair offer of settlement to the plaintiff within a reasonable time after receiving the plaintiff's October 1994, settlement demand," that is, prior to the sending or receipt of the ch. 93A demand

App. Ct. 2010).  The Supreme Judicial Court has granted further appellate review, *Rhodes v. AIG Domestic Claims, Inc.*, 942 N.E.2d 182 (Mass. 2011) and that review is still pending.  In any event, issues related to the timing of the ch. 93A demand letters were not raised or addressed on the appeal in *Rhodes*.

letter.  *Id.* at 947.  Similarly, in this case, if liability was reasonably clear in 2005, Vermont Mutual violated chs. 176D, § 3(9)(f) and 93A, even though it had not yet received a demand letter.[6]

2.  "Reasonably Clear" Standard

An insurer's duty to settle does not arise until "liability has become reasonably clear."  MASS. GEN. LAWS ch. 176D, § 3(9)(f). Massachusetts courts have emphasized that this provision does not "penalize insurers who delay in good faith when liability is not clear and requires further investigation."  *Clegg*, 676 N.E.2d at 1140.  An insurer's failure to prevail in court is not determinative of whether liability was reasonably clear at some prior point in time.  "Liability under c. 176D and 93A does not attach merely because an insurer concludes that it has no liability under an insurance policy and that conclusion is ultimately determined to have been erroneous."  *Pediatricians, Inc. v. Provident Life & Accident Ins. Co.*, 965 F.2d 1164, 1173 (1st Cir. 1992).  An insurer who takes "[a] plausible, reasoned legal position that may ultimately turn out to be mistaken — or simply . . . unsuccessful — is outside the scope of the punitive

---

[6] Vermont Mutual also relies on *Van Dyke v. St. Paul Fire & Marine Inc. Co.*, 448 N.E.2d 357, 359 (Mass. 1983), for the proposition that the obligation under MASS. GEN. LAWS. ch. 176D, § 3(9) only arises after receipt of a ch. 93A demand letter. However, that case does not shed light on this issue, because there is no indication in the *Van Dyke* opinion regarding when the demand letter alleged that liability became reasonably clear.

aspects of the combined application of c. 93A and c. 176D."
*Guity v. Commerce Ins. Co.*, 631 N.E.2d 75, 77 (Mass. App. Ct.
1994).  As a result, an insurer is "not required to put a fair
and reasonable offer on the table until liability and damages
[are] apparent" or if "there exist[s] a legitimate difference of
opinion as to the extent" of liability.  *Bobick v. U.S. Fid. &
Guar. Co.*, 790 N.E.2d 653, 659-60 (Mass. 2003) ("*Bobick II*").

The question whether liability is reasonably clear depends
on "'whether a reasonable person, with knowledge of the relevant
facts and law, would probably have concluded, for good reason,
that the insurer was liable to the plaintiff.'"  *Nyer v.
Winterthur Int'l*, 290 F.3d 456, 461 (1st Cir. 2002) (quoting
*Demeo v. State Farm Mut. Auto. Ins. Co.*, 649 N.E.2d 803, 804
(Mass. App. Ct. 1995) (Rescript)).  This is an objective
standard, *Demeo*, 649 N.E.2d at 804, which takes into account the
totality of the circumstances.

The determination of whether liability is clear "encompasses
both fault and damages."  *Clegg*, 676 N.E.2d at 1140.  In
circumstances where contributory liability is at issue, liability
is not "reasonably clear" where each party's proportionate share
is indeterminate.  Even if fault on the part of the insured party
has been "ascertained," if "the percentage of damages
attributable" to that party is "the subject of good faith
disagreement," liability is not clear.  *Bobick II*, 790 N.E.2d at

660; *see also Demeo*, 649 N.E.2d at 805 (liability not reasonably clear where the likelihood that the insured was "*solely* responsible . . . was approximately equal to the probability that the jury would find" another party partially liable as well).  As a result, even if an insurer has concluded that fault has attached, doubt as to either damages or the proportionate share of damages may prevent liability from being reasonably clear.

   3.  Liability Was Not "Reasonably Clear" in May 2005

   Plaintiffs argue that a reasonable person with knowledge of the law and the facts known to Vermont Mutual by May of 2005, would have concluded at that time that the Garfields were liable for Mr. Scott's injuries.  They cite the following facts in particular as demonstrating that Vermont Mutual should have determined that liability was reasonably clear: (a) Mr. Scott's account of the accident; (b) Mr. Scott's treatment and medical expenses; (c) the theories of liability brought by the Plaintiffs; (d) the statements Mr. Garfield was alleged to have made with respect to the condition of the porch; and (e) expert testimony regarding the condition of the porch and Sanitary Code and Building Code violations.  Plaintiffs also point to outside counsel's recommendation to Vermont Mutual to offer a settlement of $200,000 to $250,000 on June 25, 2005 as evidence that liability was reasonably clear by that time.

Vermont Mutual counters that its doubts as to the plausibility of Mr. Scott's story, the alleged under-reporting of Mr. Scott's alcohol consumption,[7] the unsettled state of the law around the implied warranty of habitability, and outside counsel's assessment of a fifty per cent likelihood of prevailing at trial together indicate that liability was not reasonably clear.

I find that there is no genuine issue of fact with respect to whether the Garfields' liability was "reasonably clear" in May of 2005.  No finder of fact could find for Plaintiffs given the uncertainty with respect to the applicability of the implied warranty of habitability and the uncertainty of the dimensions of Mr. Scott's contributory negligence.  These uncertainties raised meaningful doubt such that liability leading to damages could not be said to be reasonably clear.

Drawing all inferences in a manner favorable to the Garfields does not change this conclusion.  No finder of fact could determine that liability was reasonably clear after discovery had been substantially completed.  Mr. Scott clearly suffered significant damages as a result of the accident, but the Plaintiffs' two theories of liability were alternatively, subject

---

[7]  At trial, Vermont Mutual's expert testified that the Mr. Scott's blood alcohol level at the hospital was consistent with his consumption of six to seven alcoholic beverages the day of the accident.

to legal uncertainty (as to the scope of the implied warrant of
habitability) and factual uncertainty (as to the scope of
contributory negligence).  No finder of fact could conclude it
was reasonably clear that the Garfields would prevail on either
theory.  For these reasons, I answer the question whether
liability was reasonably clear as of May 2005  "No," as a matter
of law.[8]

## B.   *Basis for Appeal and Obligation to Pay Partial Judgment*

As described *supra* at Section I.C, Vermont Mutual appealed
the trial court judgment with respect to the applicability of the
implied warranty of habitability to a guest of a tenant and
evidentiary rulings concerning the Garfields' spoliation of the
porch columns and the admissibility of amounts paid by Mr.
Scott's health insurer to settle his medical bills.  Plaintiffs
do not directly challenge the reasonableness of the appeal as to

---

[8] The uncertainty attending Plaintiff's theories of
liability readily distinguish this case from the recent Appeals
Court decision in *Chery v. Metro Prop. & Cas. Ins. Co.*, 448
N.E.2d 1278 (Mass. App. Ct. 2011).  *Chery* concerned a failure to
pay personal injury protection benefits, which are meant to be
effectively automatic under the Massachusetts no-fault insurance
scheme, Mass. Gen. Laws ch. 90, § 34M.  Kathleen T. Ryan Dacey, *"No
Fault"-End of a Civilized Tort System?*, 6 New Eng. L. Rev. 79
(1970); *see also, Fascione v. CNA Ins. Cos.*, 754 N.E.2d 662, 665
(Mass. 2001) ("[Mass. Gen. Laws ch. 90, §34M] creates a right to
payment of [personal injury protection] benefits as loss accrues,
on receipt of reasonable proof of the fact and amount of that
loss.") As a result, there was no dispute that the insurance
company in *Chery* had an obligation to settle the plaintiff's
claims.  For the reasons outlined in this memorandum, I find that
there was no such certainty with respect to Vermont Mutual's
liability for the Scotts' claim.

the warranty of habitability and instead argue that Vermont
Mutual should have paid the portion of the claim that would be
owed even if the judgment on the warranty of habitability were
overturned — the eighty per cent attributable to the Garfields on
the negligence claim.  Plaintiffs argue that the merits of the
appeal as to evidentiary rulings was dubious and that the
"decision to appeal the judgment on the negligence claim was an
unfair and deceptive trade act."  The relevant question is
whether, at the time of the Superior Court judgment, Vermont
Mutual had an obligation to settle some or all of the judgment
amount.

I find first, that there is no obligation to settle claims
partially where the total liability is not reasonably clear.
Second, I find that the magnitude of the judgment remained
uncertain pending the outcome of the appeal.

With respect to the partial settlement of claims, in *Lazaris
v. Metro. Prop. & Cas. Ins. Co.*, 703 N.E.2d 205 (Mass. 1998), the
Supreme Judicial Court addressed whether insurers could insist on
the release of all claims against an insured in exchange for
payment of the policy limit, where liability was reasonably clear
and the damage unquestionably exceeded the policy limits.  The
Court concluded that an insurer complies with ch. 176D, § 3(9)(f)
if it makes such an offer, because "a claim is settled within the
meaning of § 3(9)(f) only when it is fully disposed of, which

23

means that the claimant has released all claims against the insured." *See id.* at 206.  "There is a difference between making a payment on a claim and settling that claim," *id.* at 207; settlement denotes the resolution of the claim, while payment does not.  *Id.*

Plaintiffs rely on *Davis v. Allstate Ins. Co.*, 747 N.E.2d 141 (Mass. 2001), to argue that the logic of *Lazaris* does not apply to post-judgment settlement.  This reliance is misplaced because *Davis* addressed whether a "pretrial offer to settle" all claims for the policy limit "terminates an insurer's contractual obligation to pay postjudgment interest."  *Id.* at 145.  After trial, Allstate could either pay the policy limit (which was less than the judgment) or pursue an appeal.  *Id.* at 146.  The Court noted that, if Allstate appealed "it could still, in order to fulfill its continuing duty to its insured, have attempted to settle, conditioning payment of the $25,000 on the plaintiff's release," however, it could not avoid responsibility for post-judgment interest imposed by the standard interest clause in motor vehicle liability policies.  *Id.*  As a result, *Davis* is consistent with *Lazaris* and explicitly states that an insurer is not obligated to proffer the policy limit unconditionally after the trial is completed, but while issues are still on appeal.

Although the case before me involves a scenario different from either *Lazaris* or *Davis*, the Plaintiffs' arguments also

raise the question of what constitutes the "settlement of claims" under § 3(9)(f).  I see no reason why the logic of *Lazaris*, that <u>settlement</u> involves the <u>release of claims</u> against the insured, rather than a partial payment on those claims, should not be applied here.  As a result, I find that Vermont Mutual did not have an obligation to pay the portion of the judgment attributable to the negligence claim.

After trial, as before, Vermont Mutual did have the obligation to settle claims promptly if liability had become reasonably clear.  As a general matter, evidentiary rulings are unlikely to be overturned on review because of the high degree of deference afforded trial courts on such issues.  *See, e.g.*, *Commonwealth v. Bly*, 862 N.E.2d 341, 357 (Mass. 2007) (noting that both findings of fact and conclusions of law in evidentiary hearings are reviewed with substantial deference).  The appellate issues involved (a) the applicability of the implied warrant of habitability to the quest of a tenant; (b) the admissibility of the amount paid by a health insurer as evidence of the reasonableness of the amounts billed; and (c) whether the trial court's ruling with respect to spoliation amounted to abuse of discretion.

Viewing the facts presented in the light most favorable to the Plaintiffs or Vermont Mutual in turn, I conclude, as a matter of law, that liability for the entire case was not reasonably

clear at the pre-decisional appellate stage.  While it appears reasonably certain that Vermont Mutual would prevail on its negligence theory, that was not the basis of the judgments on appeal, rather the more generous damage award was based on the first impression issue of the implied warranty of habitability. In *Scott*, the Supreme Judicial Court held for the first time that a guest of a tenant may recover from a landlord for breach of the implied warranty.  912 N.E.2d at 1004-06.  Because the warranty had never been applied in these circumstances, its applicability was uncertain.

In addition, the admissibility of payments made by a health care insurance company, as evidence of the reasonableness of amounts billed, is an issue that has been the subject of debate by both legislatures and courts*, see id*. at 1011-12 (Cordy, J., concurring).  In his concurring opinion, Justice Cordy observed that "Massachusetts appellate courts have not had occasion to decide whether evidence of a discount from the initial charges for medical services is barred by the collateral source rule." *Id*. at 1011.[9]   Most courts that have considered the issue have

---

[9]   The collateral source rule bars "the reduction of the plaintiff's compensation award by the amount of benefits the plaintiff receives from third parties," typically insurance companies, and also prohibits "admission of evidence of the existence of the collateral source or the receipt of such benefits as irrelevant to the issue of damages." *Scott*, 912 N.E.2d at 1011 (Cordy, J., concurring) (citing *Corsetti v. Stone Co.*, 483 N.E.2d 793, 801-02 (1985)).

maintained that the discounted amounts should be excluded, either because the discount itself is a form of third party benefit, or because the admission of evidence of amounts paid would "allow in through the back door" evidence of a third-party payor.  *Id.* at 1012.

Justice Cordy (joined by Justice Botsford) rejected the majority view and sided with the minority position that "the price that a medical provider is prepared to accept for the medical services rendered is highly relevant to" the determination of their reasonable value.  *Id.* at 1014.  Although the majority held that the "collateral source rule required that the amounts actually paid to the health care providers by the health insurer be redacted on the medical bills admitted into evidence," *Scott*, 912 N.E.2d at 1009, Justice Cordy's opinion reflects a dispute among courts which demonstrates that the Supreme Judicial Court's stance on the issue was uncertain at the time the appeal was brought.[10]  The unsettled nature of this issue is demonstrated by the Supreme Judicial Court's holding in *Law v. Griffith*, 930 N.E.2d 126 (Mass. 2010), issued less than a

---

[10]  Both the majority and the concurrence note that the Garfields did not proffer sufficient evidence to show that Mr. Scott's health care providers accepted less than the full amount billed in order to lay the proper foundation for a challenge to the collateral source rule.  *See id*. at 1010; *id*. (Cordy, J., concurring) at 1010 n.1.  However, the trial court ruled on the basis of the collateral source rule, and not the sufficiency of foundational evidence.  *Id*. at 1010.

year after *Scott*, in which it found that, although a Defendant may not present evidence of the amounts actually paid by a third-party, evidence as to the *range of payments* accepted by the healthcare provider is admissible.  *Id.* at 134-36.[11]

For these reasons, I find no showing that the arguments presented by Vermont Mutual on appeal were so lacking in merit that a failure to settle the case in its entirety before the appeal was concluded would be actionable under § 3(9)(f) of ch. 176D.

---

[11]  The third issue raised by Vermont Mutual on appeal, the trial judge's ruling with respect to the spoliation of columns, was more speculative in nature.  Vermont Mutual argued that, because the Scotts' original counsel instructed Mr. Garfield to retain only the railing, there can be no finding of negligent spoliation.  The Supreme Judicial Court found no error in the ruling that the loss of the columns constituted spoliation. It observed:

> There was no factual dispute that Garfield, as the landlord, had been in control of the columns after the accident, and that at the time when the columns were discarded, Garfield knew that he would likely be involved in litigation.  In these circumstances, he should also have recognized the logical connection between the columns and the railings such that he reasonably should have appreciated the possible importance of the columns as evidence in such litigation.  On the basis of these uncontested facts, Garfield had a duty to preserve the columns.

*Scott*, 912 N.E.2d at 1008.  In summary, the obvious relevance of the columns as evidence of the condition of the porch and the lack of such evidence as a spoliation sanction undermined possible mitigation of Mr. Garfield's negligence.  As a prospective appellate issue, however, it was unlikely - but not inconceivable - that the spoliation question would generate a new trial.

**C.**   ***Reasonableness of Settlement Offer and Conditioning Settlement on Release of Ch. 93A and 176D Claims***

Plaintiffs argue that Vermont Mutual violated chs. 93A and 176D by engaging in the unfair settlement practices of (1) making an unreasonably low settlement offer in March of 2006, when it offered $48,000 for the settlement of the claims, and (2) conditioning settlement on the release of claims against both the Garfields and Vermont Mutual.   I consider each allegation in turn.

### 1.   Reasonableness of March 2006 Settlement Offer

At a conciliation meeting in March of 2006, counsel for Vermont Mutual indicated that he had the authority to offer only $48,000 to settle the claims.   Plaintiffs allege that the $48,000 settlement offer made in March of 2006 was unreasonably low.   In *Clegg*, the Supreme Judicial Court affirmed a finding that an "'unreasonably low,' 'unrealistic,' and 'unjustified'" settlement offer violated the duty to effectuate the fair and equitable settlement of claims under ch. 176D, § 3(9)(f) where the insurer "had amassed enough information to know it was highly probable that it would be liable to the full extent of its policy."   676 N.E.2d at 1141.   Plaintiffs argue that Vermont Mutual's low settlement offer was unreasonably low and constituted "a knowing and willful unfair and deceptive act."

As noted, the obligation to proffer a reasonable settlement does not arise until liability becomes reasonably clear and,

after that point, it is recognized that such an offer will be
made in the context of negotiation. *Bobick II*, 790 N.E.2d at
660. "'The statute . . . does not call for [a] defendant's final
offer, but only one within the scope of reasonableness.'" *Id.*
(quoting *Forcucci v. United States Fid. & Guar. Co.*, 11 F.3d 1, 2
(1st Cir. 1993)).

Plaintiffs do not argue Vermont Mutual had obtained
additional information between May 2005 and March 2006
demonstrating that liability was reasonably clear. For the
reasons stated above, I find, as a matter of law, that liability
was not reasonably clear either as of May 2005, or by extension,
March 2006. I cannot conclude that Vermont Mutual was under an
obligation to effectuate the settlement of claims.

### 2. Conditioning Settlement on Release of Claims Against Vermont Mutual

Plaintiffs further argue that Vermont Mutual's July 17, 2006
settlement offer, which was conditioned on the release of claims
against Vermont Mutual as well as the Garfields, constituted an
unfair or deceptive trade practice. Plaintiffs rely on *Sterlin
v. Commerce Ins. Co.*, No. 200301965, 2009 WL 323455, at *9 & n.3
(Mass. Super. Ct. 2009), in which the court found that a similar
release, although not explicitly prohibited by ch. 176D, § 3(9),
was analogous to practices prohibited by subsection (m) of §
3(9). Subsection (m) describes the unfair or deceptive trade act
of "[f]ailing to settle claims promptly, where liability has

become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage."

The prohibition in § 3(9)(m) is an expansion on the obligation to "effectuate prompt, fair and equitable settlements" under § 3(9)(f).  Subsection (m) describes a specific type of unfair settlement practice, that of holding one claim hostage to the settlement of another.  I agree with the conclusion in *Sterlin* that, where liability is reasonably clear, an insurer that "resist[s] offering the full policy limits unless [the insurer] itself could also receive release for its own liability by the payments of its insured's benefits" may constitute an unfair settlement practice.  *Sterlin*, 2009 WL at *9.  By requiring the release of its own liability for payment of the insurance policy when liability is reasonably clear, an insurance company seeks "to have the insurance coverage afforded to its insured . . . cover its own liability to plaintiff for any statutory violations."  *Id.* at *9 n.3.  However, such an offer is not an unfair or deceptive trade practice unless liability is reasonably clear.

In *Phoenix Home Life Mut. Ins. Co. v. Brown*, 732 N.E.2d 901 (Mass. App. Ct. 2000), for example, the Appeals Court affirmed a trial judge's finding that an insurer did not violate ch. 176D, § 3 when it conditioned payment on a life insurance policy upon a

release of claims against it.  In that case, it was disputed which party should receive the proceeds of the policy and the insurer "had a reasonable and good faith belief that it could not lawfully make payment" to a party "under the terms of its policy." *Id*. at 904.  In *Phoenix*, the insurer's obligation to make payment was not reasonably clear, because it was unclear to whom the payment should be made.  This is the obverse of *Sterlin*, where the insured's liability was reasonably clear at the time the release was requested.  2009 WL at *9.

In this case, Vermont Mutual had a good faith basis for believing that the Garfields' liability was not reasonably clear before trial (and after).  As a result, it had no obligation to make an offer of settlement under ch. 176D, § 3.  Vermont Mutual offered to settle, despite the lack of an obligation to do so, but this act did not trigger the applicability of the rule set out in *Sterlin*, that an insurer may not condition payment on a claim on its own release <u>when liability is reasonably clear</u> in the underlying insurance action.  Although an offer to settle a claim where liability is clear, conditioned on the release of viable ch. 93A liability, may constitute an unfair or deceptive act or practice, an offer to settle claims where the liability is unclear is not.

**D.   *Obligation to Conduct a Reasonable Investigation and Evaluate the Case in Good Faith***

Lastly, Plaintiffs argue that Vermont Mutual violated ch. 93A by "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information."  MASS. GEN. LAWS ch. 176D, § 3(9)(d).  In particular, Plaintiffs allege that Vermont Mutual (a) failed to develop a reasonable theory of the case; (b) failed to objectively evaluate all of the evidence of the case; and (c) failed to follow standard industry practices in investigating and assessing the claim.

Plaintiffs argue that Vermont Mutual's articulation of the facts supporting the Garfield's defense was unreasonable and represented a "contorted view of the evidence" that resulted from apparent bias.  They do not specify any concrete investigatory steps that Vermont Mutual did not take or lines of inquiry that went unpursued, although such evidence would provide the basis for ch. 176D, § 3(9)(d) violations.  *See, e.g.*, *Martinez-Rivera v. Commerce Ins. Co.*, 2011 WL 3276684, *8 (Mass. Super. Ct. April 11, 2011) (finding a violation where the adjuster "purposefully and strategically" failed to pursue a line of inquiry because he suspected it would be unfavorable to the defense); *Sterlin* 2009 WL at *8 (finding a violation where, among other things, the insurer "failed to interview parties and persons with knowledge of the facts of the accident," and failed to obtain photographs of a damaged vehicle prior to repair); *Gentile v. Commerce Ins.*

33

*Co.*, 2006 WL 2766358, *4 (Mass. Super. Ct. Sept. 13 2006) (citing specific lines of inquiry not pursued by insured in its investigation as supporting the conclusion that a reasonable investigation was not conducted); *cf. O'Sullivan v. Hingham Mut. Fire Ins. Co.*, 2009 WL 2438329, at *3 (Mass. App. Div. Oct. 24, 2008) (citing concrete actions taken in the conduct of an investigation to support a finding that a reasonable investigation had been undertaken); *Cytosol Labs., Inc. v. Fed. Ins. Co.*, 536 F.Supp.2d 80, 95 (D.Mass. 2008) (citing proactive inquiries made by insurer as evidence of a reasonable investigation).  Vermont Mutual did not ignore evidence or fail to inquire about Mr. Scott's claims and gather information about the incident, as is evidenced from the available records of its investigation.

Plaintiffs argue that Vermont Mutual's analysis of the facts exhibited bias and was unreasonable.  An insurer is "required to analyze the legal issues objectively to determine if liability and damages [are] reasonably clear" and must ensure that no improper motivations color the decisions with respect to settlement.  *Tallent v. Liberty Mut. Ins. Co.*, 2005 WL 1239284, at *14 (Mass. Super. Ct. Apr. 22, 2005); *see also Sterlin* 2009 WL at *8 (failure to "take advantage of and to consider objectively the readily available evidence of the occurrence" contributed to the finding that insurer did not undertake a reasonable

investigation).  As explained *supra* in Sections II.B & C,
liability was not reasonably clear either before or after trial
for the reasons articulated by Vermont Mutual and its counsel in
their internal communications, particularly given open questions
with respect to contributory negligence on the part of Mr. Scott
and the unsettled state of the implied warranty of habitability.

Finally, Plaintiffs assert that their expert's testimony
would demonstrate Vermont Mutual's failure to "implement a prompt
and fair investigation of the Scotts claim."  The expert report
summarizes the reasons given by Vermont Mutual for deciding that
liability was not reasonably clear and summarily concludes that
based on the facts available at the time, that position was
unreasonable.  *See* Aff. Paul F. Amoruso, Dkt. No. 23, Ex. A at 8-
20.  As is apparent in the extended discussion provided by this
Memorandum, I reject the expert's legal conclusion.  There is no
basis for finding that Vermont Mutual failed to consider the
matter objectively, was biased in any way unusual for an
adversary in a contested matter or was otherwise unreasonable in
its analysis.

### III.  Conclusion

For the reasons stated herein, I find that judgment as a
matter of law is warranted in favor of Vermont Mutual on all

counts.[12]  I therefore GRANT Vermont Mutual's motion for summary

judgment (Dkt. No. 15) and DENY Plaintiff's cross-motion (Dkt.

No. 31).


                              */s/ Douglas P. Woodlock*
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE


---

     [12]  Neither party directly addressed the merits of Count 1
of the Complaint which alleges that Vermont Mutual failed to
adopt or implement reasonable standards for the prompt
investigation of claims, which constitute an unfair claim
settlement practices under MASS. GEN. LAWS ch. 176D, § 3(9)(c).
Both parties sought summary judgment on all counts in their
respective motions, and so I decide this issue on the record
before me.  Plaintiffs have not marshaled any facts with respect
to the content of Vermont Mutual's standards, their
implementation, or how they were unreasonable in this
circumstance.  Their expert's report contains an excerpt of
Vermont Mutual's Claims File Handling Guidelines, recites the
history of the claim handling, and summarily concludes that
Vermont Mutual failed to adopt and implement a prompt
investigation and evaluation of the Scott's claims.  Aff. Paul F.
Amoruso, Dkt. No. 23, Ex. A at 6-8.  Viewed in the light most
favorable to the Plaintiffs, I find that they have not alleged
sufficient facts to demonstrate that Vermont Mutual failed to
adopt or implement reasonable standards.